I,WALTZER, Judge.
Defendant, Melvin Porche, appeals his conviction and sentence for aggravated rape, aggravated burglary and aggravated crime against nature. Porche argues that he was denied effective counsel after the trial court denied his motion for continuance.
On 14 January 1999, Melvin Porche was charged by bill of indictment with one count each of aggravated rape, aggravated burglary and aggravated crime against nature. Porche was represented by appointed counsel at the pre-trial motion hearings on 8 March 1999 and 26 May 1999. Retained counsel enrolled on 16 July 1999. Due to the enrollment of new counsel, the trial set for 21 July 1999 was continued and reset for 30 August 1999. On the latter date, the court found Porche guilty as charged on all counts.
On 10 September 1999, the trial court sentenced Porche on the aggravated rape to life imprisonment at hard labor, without benefit of probation, parole or suspension of sentence. He was sentenced to five years at hard labor on each of the other counts, with the sentence for aggravated crime against nature without benefits of probation, parole or suspension of sentence. The court ordered all 1 ^sentences to run concurrently. The same day, the trial court denied Porche’s motion for new trial and granted his appeal.

STATEMENT OF THE FACTS

[1]

Around Thanksgiving of 1998, the victim lived with her son in a five-unit townhouse-style apartment building owned by her *1154 mother. Relatives of the victim lived in two other units. The defendant’s mother lived in another of the units. The victim saw the defendant around the apartment occasionally when he visited his mother. She knew him by face only. On Thanksgiving Day, the defendant tried to make conversation with the victim as she carried things to her car to take to her grandmother’s house. She told him she was busy and could not talk. The defendant called the victim by name, which startled her. She asked him how he knew her name, and he replied that he knew her relatives in the building. She wished him a happy Thanksgiving and left. At her grandmother’s house, the victim asked her aunt if she had told the defendant her name. The aunt could not recall.
Over the next couple of days, the defendant attempted to talk to the victim on several other occasions. On one occasion, he grabbed her hand so tightly that it hurt, but she consistently told him she was busy and could not talk to him.
On 29 November 1998, the Sunday following Thanksgiving, the victim and a girlfriend visiting her from Baton Rouge saw the defendant as they returned from a restaurant. The women said “hello” and kept walking. The girlfriend retrieved her things and drove away. As the victim returned to her apartment after saying goodbye to her friend, she heard her phone ringing. She had no phone downstairs, |3so she ran to the phone upstairs. She missed the call, but saw from the caller I.D. box that the call came from her mother’s house. The victim called there and found out that her son was going to a movie with her mother. The victim made a couple of other calls and rested the phone on her chest while she contemplated getting her son’s things ready for school the next morning.
The victim was then startled by a noise. She looked up to find the defendant standing over her with her son’s trophy. He pushed the victim off the chair and onto the floor. He began striking her with the trophy until it broke, then struck her with her iron. He also grabbed a belt from the victim’s closet and tied it around her neck. The victim managed to save breathing room by forcing her hand between her neck and the belt. The defendant tore off the victim’s clothing, forced his penis into her mouth, raped her vaginally, then turned her over and raped her anally.
In the course of the beating and sexual assault, the defendant told the victim that none of this would have happened if she had talked to him. He further told her that, because she had seen him and knew his face, he would have to kill her. The victim pleaded with the defendant to spare her life and promised that she would not tell anyone about what he had done. The defendant also told her that he knew where her mother lived, and that he would come for the victim, her son and her family-
Finally, the phone rang. The defendant told her not to move and told her again that he would have to kill her. She again pleaded for her life and promised not to tell anyone. The defendant then told her to put on some clothes. He pushed her to the stairs and down the stairs. He asked her if she had any money or guns. She replied negatively. The defendant then walked out the door.
1/The victim locked her door, then paged her girlfriend, who did not call back right away because she was on the road. She then called a male friend who came over. However, before her male friend arrived, the defendant came back. The victim turned out all of the lights and screamed until her male friend arrived. The friend then drove the victim to her grandmother’s house. As they left the apartment building, the defendant spoke to them as if nothing had happened. Once the victim got to her grandmother’s house, the victim’s aunt called 911 and reported that the victim had been beaten. The victim got on the phone, but did not report that she had also been raped.
Officer Barry Adams responded to the call. He observed the victim’s visible inju *1155 ries, took the victim into a room separate from her family members, and encouraged her to tell him what happened. She then related the sexual assaults to the officer. In the meantime, the victim’s grandfather came in and said the suspect was still in front of his mother’s apartment talking on the phone. Officer Adams called this information in to the department. Officers in the area then detained the defendant and advised Officer Adams to come to the scene with the victim for an identification. The victim positively identified the defendant as the perpetrator.
Once the victim made the identification, Detective Easterlyn McKendall took over the investigation. She took the victim to the hospital for a standard rape examination. The examining physician testified to the history of the incident as related to her by the victim. The physical examination confirmed the beating related by the victim. The physician testified that the examination revealed no evidence of trauma to the vaginal or anal area, but opined that this was not unusual in an adult woman.
A criminalist with the police department testified that she tested items of clothing worn by the defendant and the victim. She found seminal fluid on the green shorts that the defendant was wearing when he was arrested and on the gray panties that the victim put on immediately after the incident. An expert in latent fingerprints found a positive match for fingerprints lifted from the scene and fingerprints taken from the defendant.

ERRORS PATENT

An errors patent review indicates that the record does not contain the back of the grand jury indictment form. Accordingly, the record does not reflect -that the indictment was endorsed “a true bill,” or that the endorsement was signed by the foreman of the grand jury, as required by LSA-C.Cr.P. art. 533(5). However, an indictment shall not be invalid or insufficient because of a defect in form only. LSA-C.Cr.P. art. 487. Assuming that the reverse of the indictment was not properly endorsed and signed, these omissions are formal defects only, and must be taken advantage of before trial by motion to quash. State v. Lee, 94-2584 (La.App. 4 Cir. 1/19/96); 668 So.2d 420; State v. White, 404 So.2d 1202 (La.1981). A motion to quash on this particular ground must be filed within fifteen days of arraignment unless a different time is provided by law or fixed by the court upon a showing of cause why fifteen days is inadequate, or it is waived. LSA C.Cr.P. arts. 521, 535. Thus, assuming there was a defect in the indictment, it was waived by the defendant’s failure to1''timely object.
In addition, the sentencing minute entry indicates that the appellant was sentenced on the same day that the trial court denied the motion for new trial. LSA-C.Cr.P. art. 873 provides that sentence shall not be imposed until at least twenty-four hours after such a motion is overruled unless the defendant expressly | fiwaives the delay or pleads guilty. However, the sentencing transcript indicates that the motion for new trial was filed after sentence was imposed. A motion for new trial on all grounds except newly discovered evidence must be filed and disposed of prior to sentence. LSA-C.Cr.P. art. 853. Accordingly, the motion was not timely filed prior to sentencing; and the trial court did not err by failing to observe a twenty-four hour delay.

ASSIGNMENT OF ERROR

The appellant argues that the trial court erred by denying the defense motion for a continuance. He maintains that defense counsel received material evidence from the State on the morning of trial and did not have an adequate opportunity to prepare the defense relative to that evidence.
To grant or refuse to grant a motion for continuance rests within the sound discretion of the trial court. State v. Martin, 93-0285 (La.10/17/94); 645 So.2d 190. A ruling will not be disturbed on appeal absent a clear showing of abuse *1156 of discretion, and a showing of specific prejudice caused by that denial. State v. Benoit, 440 So.2d 129 (La.1983). When a motion to continue is based upon a claim of inadequate time to prepare a defense, the specific prejudice requirement has been disregarded only when the time has been “so minimal as to call into question the basic fairness of the proceeding.” State v. Jones, 395 So.2d 751, 753 (La.1981). The reasonableness of discretion issue turns upon the circumstances of the particular case. State v. Simpson, 403 So.2d 1214 (La.1981).
The appellant claims that the denial of the continuance resulted in ineffective assistance of counsel. Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Reed, 483 So.2d 1278 (La.App. 4 Cir.1986). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Garland, 482 So.2d 133 (La.App. 4 Cir.1986).
A defendant’s claim of ineffective assistance of counsel is to be assessed by the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Fuller, 454 So.2d 119 (La.1984). The defendant must show that counsel’s performance was deficient and that the deficiency prejudiced the defendant. Counsel’s performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the “counsel” guaranteed to the defendant by the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064. Counsel’s deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 693, 104 S.Ct. at 2068. The defendant must make both showings to prove that counsel was so ineffective as to require reversal. State v. Sparrow, 612 So.2d 191, 199 (La.App. 4 Cir.1992).
The appellant compares his case to State v. Laugand, 99-1124 (La.3/17/00); 99-1327 (La.3/17/00), 759 So.2d 34. In that case, the Louisiana Supreme Court reversed this court and set aside the appellant’s conviction, finding agreement with J. Plot-kin’s reasoning in dissent that forcing an unprepared attorney to go forward |swith trial punishes the defendant, who is unable to present an adequate defense, not the attorney.
In Laugand, counsel was appointed the day before the scheduled trial date. The trial was continued for one month, but counsel was unprepared due to a scheduling conflict. In the instant case, counsel was retained a week prior to the scheduled trial date. Counsel alleged that he was unprepared because he received, on the day of trial, a portion of a pre-trial hearing at which the victim testified. In denying the motion to continue, the trial court noted the following:
For the record, also, the Court has reviewed the transcript, the second transcript, I believe or did sometime back several weeks ago at least have the transcript from part of the motion hearings. The Court has reviewed the transcript that yoh did receive this morning. The Court does not believe that there is anything in this transcript which would necessitate a continuance.
The Court would note for the record is that the court reporter has told me that on Friday she did offer to fax the transcript to Mr. Gorrell’s office, Mr. Gorrell declined and said he would just pick it up this morning, so the Court is going to deny the defense Motion for *1157 Continuance. But we’ll pass this for a few minutes and get Mr. Gorrell before we call for a jury.
After the court began remarks to a potential jury panel, the court and the lawyers met in chambers, at which time the appellant advised that he preferred a judge trial. The court questioned the appellant personally to confirm that the waiver of the right to trial by jury was knowing and intelligent. At that point, defense counsel re-urged the motion to continue alleging that he had just heard the 911 tape, and had been previously unaware of the tape’s existence. The prosecutor responded that the tape had been in the property room available to the defendant for eight months. The prosecutor further noted that the dispatcher’s notes, which | owere turned over to the defense, indicated that a call was made to the police department.
As to the transcript, defense counsel did not deny, at trial or on appeal, that the court reporter offered to fax the subject transcript on the Friday prior to the Monday trial. However, defense counsel’s failure is not the issue, but rather did the lack of the transcript cause the appellant to receive inadequate representation.
A review of the subject transcript indicates that the questioning of the victim was limited to her identification of the defendant. She testified that she had seen the defendant around the apartment several times before the attack; that the defendant was in the apartment for thirty to forty-five minutes; that it was daytime; and that the defendant had no mask or other covering on his face. She further testified that she identified the defendant as the perpetrator when she was taken to the scene where he was being detained. Her trial testimony was consistent as to each of these facts. The appellant does not contest the identification. He thus fails to show how a lengthy review of this testimony would have helped his defense.
As to the 911 tape, the first witness in the 8 March 1999 motion hearing testified that he received the 911 call. Counsel timely received the transcript of that hearing. Thus, counsel could not allege that he was unaware of the existence of the tape, but for his failure to carefully review the transcript which was timely provided. Nevertheless, the issue remains, was the appellant denied effective assistance of counsel by the lack of the tape.
The tape was played at trial. It was not transcribed for the record. However, defense counsel cross-examined the victim extensively relative to her statements on the tape. From that testimony, it is apparent that the victim did not advise the 911 operator that she had been sexually assaulted. In particular, she told the |inoperator that she urinated on herself before the perpetrator could do anything. She also advised that she was “fine,” when asked if she needed medical attention.
On cross-examination, the victim admitted that it was her voice on the tape, but testified that she did not recall what she said to the 911 operator. She testified that she did not immediately tell her family that she had been raped because she did not want to upset her mother or her son. She further testified that her father was dying of cancer during the weeks prior to the assault and, compared to him, she was fine. She testified that she could walk and preferred going to her own doctor than to Charity Hospital, so she declined medical attention. However, she cooperated when the investigating officer advised her that she would have to be examined at Charity Hospital.
In Laugand, the court noted instances in the transcript which indicated that defense counsel’s general lack of preparation affected the appellant’s ability to present an adequate defense. In the instant case, the appellant does not argue that counsel was generally unprepared for trial. Rather, he argues that counsel was unprepared due to his failure to timely receive a particular transcript and the 911 tape.
The subject transcript was limited to the admission of the identification, which the appellant does not assign as error. De *1158 spite hearing the 911 tape for the first time on the day of trial, defense counsel competently cross-examined the victim relative to discrepancies between her statements on the tape and her trial testimony. Accordingly, the denial of the motion to continue did not result in a denial of effective assistance of counsel.
I,, CONCLUSION
We affirm the convictions and sentences.
CONVICTION AND SENTENCE AFFIRMED.

. Because this case involves a sexual assault, the victim's name is not used in this opinion.